Matter of V.R. (2004 NY Slip Op 51706(U))

[*1]

Matter of V.R.

2004 NY Slip Op 51706(U)

Decided on December 22, 2004

Family Court, Monroe County

O'Connor, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected in part through October 1, 2007; it will not be published in the printed Official Reports.

Decided on December 22, 2004

Family Court, Monroe County
In the Matter of V.R., A Child under the Age of Eighteen Years Alleged to be Neglected by B. J., Respondent.
NN 5616-04

LORI ANN RICCI, ESQ., for Petitioner Monroe County
Department of Human and Health Services
JOSEPH P. CRIMI, ESQ. and TYNISE EDWARDS, Assistant Conflict Defenders, for Respondent mother
STEVEN WEISBECK, ESQ., Law Guardian

Marilyn L. O'connor, J.
NOTICE: WILLFUL FAILURE TO OBEY THE TERMS AND CONDITIONS OF THIS ORDER AND THE ORDER OF PROTECTION CONTAINED HEREIN MAY RESULT IN COMMITMENT TO JAIL FOR A TERM NOT TO EXCEED SIX MONTHS.
NOTICE: PLACEMENT OF YOUR CHILD IN FOSTER CARE MAY RESULT IN YOUR LOSS OF YOUR RIGHTS TO YOUR CHILD. IF YOUR CHILD STAYS IN FOSTER CARE FOR 15 OF THE MOST RECENT 22 MONTHS, THE AGENCY MAY BE REQUIRED BY LAW TO FILE A PETITION TO TERMINATE YOUR PARENTAL RIGHTS AND MAY FILE BEFORE THE END OF THE 15-MONTH PERIOD.
DEADLINE: IF THE CHILD REMAINS IN FOSTER CARE, A PETITION FOR THE NEXT PERMANENCY HEARING MUST BE FILED NOT LATER THAN MAY 27, 2005.
MARILYN O'CONNOR, J. :
[*2]
Respondent/mother, a homeless, unemployed drug abuser and prostitute, has given birth to seven children, apparently with seven different fathers.[FN1] This neglect case is about the youngest child, Anna, born in the spring of 2004. All of respondent's children were removed from her care and custody because she could not and did not take care of them. For the reasons set forth below, the respondent/mother is hereby found to have neglected baby Anna, and a judgment and order will be entered with that finding and with conditions to be met by respondent/mother if she wishes to have Anna returned to her care.[FN2] Because every child born deserves a mother and a father, or at the very least a mother or a father, this court is once again taking the unusual step of ordering this biological mother/respondent to conceive no more children until she reclaims her children from foster care and other caretakers, or until the jurisdiction of this court over her expires. (In re Bobbijean P., 2 Misc 3d 1011A).[FN3]
 As set forth by New York's highest court in the seminal custody case, Bennett v Jeffreys, "The parent has a 'right' to rear its child, and the child has a 'right' to be reared by its parent" (40 NY2d 543, 546, emphasis added). Furthermore (Bennett, supra , at p 548), wisely states, "These [parental] 'rights' are not so much 'rights', but responsibilities. . . ." In light of the common sense reasoning of Bennett, and other compelling case law, this court concludes that a parent has the responsibility to rear his or her children, but not an unlimited right to bear children irresponsibly. This decision continues the rational reasoning begun with In re Bobbiejean (supra ) to protect the well-being and rights of children without unduly interfering with the choices of their parents.
RESPONDENT'S EARLIER NEGLECT AND TERMINATION PROCEEDINGS
The respondent has been neglecting her children since at least 2000. The first neglect proceeding against respondent was filed in late 2000, involved her five oldest children and resulted in a neglect finding for four of the children in early 2001. The fifth child was officially placed in the custody of a purported paternal aunt with whom he had lived since he was 4 months old, and thus the neglect charges were dismissed. Neglect in a second case against respondent [*3]was found in late 2002, regarding a baby born only 14 months after the first neglect finding.[FN4] Respondent's parental rights to two of her children were terminated in 2003, by order of this court.[FN5] This 2004 proceeding is the third neglect case against respondent/mother.
PETITION/PROCEDURES
This third neglect case, involving Anna, born in the spring of 2004, was filed four days after her birth. While respondent managed not to lose her oldest child till that child was 8 years old, the latest baby was removed from her care as soon as she could be released from the hospital. Clearly respondent's ability to parent, apparently once existing at least minimally, has deteriorated. Anna, who was born with a positive toxicology for cocaine, was taken by the Department of Human and Health Services ("the Department") directly from Strong Memorial
 Hospital on an emergency removal basis and placed in emergency foster care.[FN6] Instead of a mother-daughter relationship beginning at birth, it nearly ceased at birth. If that important relationship is to be put in place instead of ended permanently, it will be through the supportive efforts of the Department to get the respondent clean and sober, and engaged with her child, beginning with supervised visitation.[FN7] This responsibility of parenting Anna falls on society because respondent has left it to us.
This respondent has had the procedural due process to which she is entitled. She was served with the summons and petition and appeared twice before the court. A hearing on the issue of neglect was held by default, but only after the respondent/mother had been advised of her rights, and had been given assigned counsel and default warnings. In late 2004, a dispositional hearing was held after the fact-finding hearing. Respondent appeared with counsel at that hearing, was advised by the court of the fact that the court had found that she had neglected her child and intended to issue a written decision in which she would be directed to conceive no more children while under the court's authority. (Counsel had all been advised of the court's intention in this regard approximately 2 ½ weeks earlier.)
After consulting with her attorney, the respondent consented to the proposed dispositional plan, but not to the additional condition regarding conceiving further children. Respondent was [*4]given additional time in which to submit argument in opposition to the condition proposed by the court. The respondent, by her counsel, agreed to submit in writing on that point and the legal issues raised thereby, and did not require further evidence or testimony. Counsel for petitioner indicated the Department would be taking no position on the issue and had no additional evidence to offer. The law guardian agreed to submit on the issue, that he had no additional evidence to offer, and ultimately took no position, pro or con. The submissions of the respondent and law guardian have been duly considered.
As required by law for a proper emergency removal, the petition alleged that Anna was at imminent risk to her life or health if left in the care of respondent mother (Family Court Act, § 1024), because she was still abusing cocaine, cannabis and alcohol, and had not completed work on any of the court-ordered goals (mental health treatment, substance abuse treatment and parenting classes) established by prior neglect orders. The imminent risk allegations were not challenged by the respondent at the time of removal. (Family Court Act, § 1027).
Despite the horrific record of the respondent with respect to her prior six children, the Department stated in its petition that the permanency goal is reunification with parent(s), as is typical and preferred. Family Court Act (§ 1055[b][vii][B][3]), states "that it is the legal responsibility of the commissioner of social services to reunite and reconcile families whenever possible and that the commissioner offers services and assistance for that purpose".[FN8] (See also Social Services Law, § 384-b [7][f]).[FN9] This goal of return to parent necessarily can only be met if respondent takes serious steps to get her life in order so that she can responsibly care for Anna. For the reasons set forth below the respondent/mother is hereby found to have neglected baby Anna.
THE FACTS FROM THE DEFAULT TRIAL
At the default trial, the only witness was Jane O'Brien, a case worker with the [*5]Department, who had served in that capacity for 4 ½ years. She testified that as the assigned child protective management caseworker, she became familiar with Anna and her mother, and a man whom she believed signed an acknowledgment of paternity regarding Anna.[FN10] O'Brien had been working on respondent's cases since January 2001, more than 3 years before Anna was born. She testified that respondent had six "indicated" child protective referrals in 1996, 1998, 1999, 2000, 2001, and 2002, as well as the prior neglect and termination findings. The court takes judicial notice of those related proceedings and orders. O'Brien testified that there was an agreement to extend the neglect order (NN 664/668 00) regarding the older children and that the respondent was required to participate in substance abuse, mental health and parenting services, but by the date of the trial had not cooperated with the Department or completed any of those programs. She noted that a Strong Memorial Hospital case worker made the mandated referral to CPS regarding Anna. That full report, including the toxicology findings, was admitted into evidence. It showed the baby was positive for cocaine, as was respondent at the time of the birth.
O'Brien testified that she discussed substance abuse treatment and family planning with the respondent. She also testified that respondent said she would seek assistance from Alternatives for Battered Women regarding housing away from Anna's putative father. She confirmed that respondent said her last drug usage was a few days before Anna's birth. O'Brien explained, as alleged in the petition, that a plan had been made for her to enter Liberty Manor to assist her with her substance abuse issues, but she never arrived at Liberty Manor despite the taxi called to take her there. She summarized that the court had been involved with all seven of the respondent's children, but none were currently in her care. She believed the last time respondent had any child of hers in her care was in 2000, and that five of respondent's seven children were currently in foster care. After testifying to the birth of the two immediately previous babies with positive toxicologies for cocaine, she asked that the court make a finding of neglect against respondent with respect to Anna.
The Department's evidence was completely unrebutted due to the default of the respondent.
LEGAL DISCUSSION
A. The Neglect Finding
 The court finds that the respondent had not completed any of the programs required by the prior neglect order, and that Anna was at imminent risk to her health and life if not removed from respondent's care. Also, the court finds that respondent neglected her responsibilities as a mother by causing Anna to be born testing positive for cocaine at a time she herself also tested positive for cocaine; and that respondent mother had tested positively for cocaine once during her pregnancy (apparently the only time she was tested during her pregnancy). A newborn infant's positive toxicology test for cocaine without more will not sustain a neglect finding, but an additional finding, such as imminent danger due to mother's drug usage history, will provide an adequate basis. Nassau County DSS ex rel Dante M. v Denise J., 87 NY2d 73; Nassau County [*6]DSS v Laquetta H, 191 AD2d 567; In re Theresa J., 158 AD2d 364; In re Stefanel Tyesha C., 157 AD2d 322, app gr 164 AD2d 852, later proceeding 559 NYS2d 813, app dismd 76 NY 1006, mot den 77 NY2d 866; Nassau County DSS ex rel Mark S. v Felicia B., 144 Misc2d 169. The court finds that the respondent had continuing drug abuse problems. Accordingly, the preponderance of the evidence establishes that the respondent has neglected her new baby Anna, so that her physical, mental and emotional condition was also in imminent danger of becoming impaired by respondent's failure to exercise a minimum degree of care. Indeed, the facts of this case meet a clear and convincing evidentiary standard although only a preponderance is required.
B. The Applicable Rules
Regarding Conditions of Dispositional Orders
Dispositional orders granted after a finding of neglect, in addition to placing the children in foster care under the supervision of the Department, routinely contain numerous conditions to be met by the subject parent in a good faith effort to reclaim his or her children from foster care. Family Court Act § 1057 states in part, The court may place the respondent under supervision of a child protective agency or of a social services official or duly authorized agency. An order of supervision entered under this section shall set forth the terms and conditions of such supervision that the respondent must meet and the actions that the child protective agency, social services official or duly authorized agency must take to exercise such supervision.
Rule 205.83 (22 NYCRR 205.83) describes what can be in those conditions. For judgments of neglect, such as this, in which respondent will be placed under the Department's supervision, the potential conditions are described in 22 NYCRR 205.83(a) & (b).
The respondent can be required to:
(1) observe any of the terms and conditions set forth in subdivision (a) of this section [regarding suspended judgments];

(2) cooperate with the supervising agency in remedying specified acts or omissions found at the fact-finding hearing to constitute or to have caused the neglect or abuse;

(3) meet with the supervising agency alone and with the child when directed to do so by that agency;

(4) report to the supervising agency when directed to do so by that agency;

(5) cooperate with the supervising agency in arranging for and allowing visitation in the home or other place;

[*7](6) notify the supervising agency immediately of any change of residence or employment of the respondent or of the child; or

(7) do or refrain from doing any other specified act of omission or commission that, in the judgment of the court, is necessary to protect the child from injury or mistreatment and to help safeguard the physical, mental and emotional well-being of the child. (22 NYCRR 205.83[b], emphasis added.)

Clearly, the court assumes extremely broad control over the life of a respondent in the event of a neglect finding, to an extent not normal in our free and democratic society, and unimaginable to most citizens. In this case what caused the abuse was using cocaine while pregnant and having a serious drug usage history. Ordering a respondent temporarily to conceive no more children is an appropriate, logical step to prevent the harmful consequences of drug abuse for any potential future child under condition 2 of subdivision (b) above. This condition also fits under condition 7, as refraining from getting pregnant again at this time will help enable this respondent to get her difficult life under control so she can care adequately for her baby Anna. Finally, some birth control methods, presumably not in conflict with respondent's religious beliefs, whatever they
 may be, fit under "medical treatment" authorized by condition 5 of subdivision (a).[FN11]
The promulgated rules also give orders "teeth" for enforcement purposes by requiring the following mandatory language: "the order shall be accompanied by a written statement informing the respondent that a willful failure to obey the terms and conditions imposed may result in commitment to jail for a term not to exceed six months" ( 22 NYCRR 205.83[c][2]).[FN12]
C. The Statutory and Case Law
Given the facts, the Family Court Act, the Social Services Law, and the applicable rules, this court concludes that a no-more-children order is lawful and should be used here. The proper [*8]analytical approach to an issue which falls within the basic constitutional concept of due process is to look at the nature of the interest at stake to see if it is within the protection of a liberty and/or property interest. (Morrissey v Brewer, 408 US 471, 481). Children are not property, and this is not simply a reproductive rights issue because a child has already been born who also has rights to be considered.[FN13] Constitutional rights regarding parents and children are about relationships, not merely biological connections or functions. (See Moore v East Cleveland, 431 US 494, where the U.S. Supreme Court, like the New York Court of Appeals in Jeffreys (supra ), implicitly recognized that the interest at stake there was the relationship between parent and child, which belongs to both.) Logically and lawfully, while there is a fundamental right to family integrity (e.g., Meyer v Nebraska, 262 US 390, 399), there is no fundamental right to give birth to children when the conditions require society raise them in all respects. Indeed, birth without any caring aspect of parenthood is the opposite of the fundamental right to family integrity, and would be more like an all too common crime, endangering the welfare of a child,[FN14] than a right deserving of protection.
Ample case law speaks of parents' rights to the "care" and "custody" and "companionship" of children, "[rights] far more precious than property rights (e.g., May v. Anderson, 345 US 528, 533). This court knows of no case law promoting as "precious" the right of parents to conceive and give birth to babies with no possibility of the parent fulfilling a corollary responsibility to care for and nurture them.[FN15] There exists, of course, a constitutional right to privacy relating to marriage, procreation, contraception, family relationships, child rearing and education. (Carey v Population Services International, 431 US 678, 685). However, it is not absolute (e.g., Roe v Wade, 410 US 113, 154).
At this point in time the respondent/mother herein has demonstrated repeatedly that she has no capacity to exercise her responsibilities toward her children, including her newest baby Anna, or to fulfill their right to be raised by her as their uniquely own biological mother. A theoretical unlimited right to bear children irresponsibly fails to consider the rights of children already born to that person, of those children who are likely to be born to such a parent, and of society in general. (Cf. Matter of Guardianship of Jones v Cardinal McCloskey Children's & Family Services, 121 AD2d 318, requiring family planning education for a woman who had four children in four years, gave up two for adoption and had a third in foster care whose father was [*9]unknown; see Domestic Relations Law, § 110, defining "adoption" as "the legal proceeding whereby a person takes another person into the relation of child and thereby acquires the rights and incurs the responsibilities of parent in respect of such other person", emphasis added.)
The U.S. Supreme Court in Stanley v Illinois (405 US 645) recognized the essential right to "conceive and raise" children, not just to have children, and justly gave unwed fathers involved with their children parental rights protected by the Federal Constitution. The U.S. Supreme Court wrote, in its most relevant part (p 651),
The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," Meyer v. Nebraska, 262 U.S. 390, 399 (1923), "basic civil rights of man," Skinner v. Oklahoma, 316 U.S. 535, 541 (1942), and "rights far more precious . . . than property rights," May v. Anderson, 345 U.S. 528, 533 (1953). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." Prince v. Massachusetts, 321 U.S. 158, 166 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra , at 399, the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra , at 541, and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496 (1965) (Goldberg, J., concurring).

But as explained in Robert O. v. Russell K. (80 NY2d 254, 262), an unwed father adoption rights case,
The guiding principle has been that the biological connection between father and child is not sufficient, in and of itself, to create a protected interest for the father. Only if the unwed father "grasps the opportunity" to form a relationship with his child will the inchoate right created by biology blossom into a protected liberty interest under the Constitution. The Lehr [v Robertson, 463 US 248] Court stated it thus: "When an unwed father demonstrates a full commitment to the responsibilities of parenthood ... his interest in personal contact with his child acquires substantial protection under the Due Process Clause ... But the mere existence of a biological link does not merit equivalent constitutional protection" (Lehr v Robertson, supra , at 261, emphasis added).

Just as a biological father may choose to grasp the opportunity to form a constitutionally protected liberty interest in a parental relationship, a biological mother may choose to grasp that opportunity. What is the difference between fatherhood and motherhood, that we would require a father to take affirmative steps to obtain his right to parent but would allow a mother all rights of parenthood immediately and automatically upon birth? Surely there is no such difference. A mother who does not and cannot grasp her existing parental responsibilities cannot reasonably be held to have a constitutional right to keep bearing more children for whom her only acts of motherhood are conceiving them, growing them in her uterus, and inevitably giving birth. Bennett v Jeffreys (40 NY2d, supra , p 546) recognized:
. . . the modern principle that a child is a person, and not a subperson over whom the parent has an absolute possessory interest. A child has some rights too, some of which are of a constitutional magnitude (cf. Goss v Lopes, 419 US 565, 574; Matter of Winship, 397 US 358, [*10]365; Tinker v Des Moines School Dist., 393 US 503, 506; Matter of Gault, 387 US 1, 47.) (Emphasis added.)

In the case at bar, the biological mother/respondent is in her early thirties and obviously could get pregnant again, intentionally or unintentionally, and have even more children. However, it has been proven that respondent does not at this time have the slightest capacity to have even a "possessory interest" in her children. The Department will be directed, among other things, to help get respondent evaluated for mental health problems and substance abuse and alcohol addictions, and to help her obtain treatment and services for her problems. This is routine. The Department of Human and Health Services is also obligated to give respondent family planning information periodically, and free family planning services if respondent desires them (Social Services Law, §131-e).
This court is not directing what steps the mother should take in order to not get pregnant. Practices are available to avoid or prevent pregnancies consistent with personal and even religious beliefs. A great variety of birth control methods are available.[FN16] Nor is the court saying that if the mother gets pregnant, she should get an abortion. Of course, the respondent/mother, like every other woman in this country, has a constitutional right to have an abortion based on the right to privacy, without regard to any neglect cases against her (Roe v Wade, 410 US 113).
 Concededly, this court cannot prevent respondent from having more children any more than laws against murder prevent all murders or laws against using harmful illegal drugs prevent all illegal drug use. However, just as there are consequences for illegal acts, there are routine, lawful consequences for breaching a court's order in a neglect case. This court has jurisdiction over respondent and the statutory duty to help rehabilitate her, if possible, into a competent parent with her children returned to her from foster care. The nature of foster care in New York has been aptly defined as "[a] child welfare service which provides substitute family care for a planned period for a child when his own family cannot care for him for a temporary or extended period, and when adoption is neither desirable nor possible" (Smith v Organization of Foster Families, 431 US 816, 823).
This court will order the respondent to conceive no more children as part of the disposition plan in this case, just as it will order her, as a routine course of business, to stop using illegal drugs and find a way to have an income and somewhere to live so that she could raise Anna. This is also (1) in the interest of her four other children for whom her parental rights have not been lawfully terminated by the court, (2) in the interest of society which is currently taking on all of the respondent's responsibilities for her children, and (3) in the interests of her potential children. Conceiving another child now would only make her rehabilitation and the return to her of her existing children more unlikely.
[*11]
In reaching the decision to order the respondent to conceive no more children (for the statutory one-year term of the order), this court has considered the following factors. The court offers these factors as a 4-prong test narrowly tailored to meet the "strict scrutiny test" for impinging on constitutional rights (see Zablocki v Redhail, 434 US 374; Alevy v Downstate Medical Center, 39 NY2d 326). This should be met by clear and convincing evidence, as it is here, before such an order is issued:
(1) a neglect case is pending against the parent involving the removal of a child; and

(2) the parent has previously had one or more children placed in foster care, voluntarily or involuntarily, or placed with a relative resource or similar individual as an alternative to foster care under the supervision of the Department; and
(3) the parent has demonstrated that he or she will not or cannot for the reasonably foreseeable future have the capacity to physically take care of the activities of daily living of a child at issue in the neglect case, i.e., providing food, clothing, shelter, health needs, education needs, etc; and
(4) the parent has demonstrated that he or she will not or cannot reasonably for the foreseeable future provide for the child's needs financially, by any legitimate means (including welfare, temporary assistance, disability payments, unemployment, wages, wages of a spouse or partner, etc.).[FN17]
Under this test, if even one of these prongs does not describe the respondent/parent, the no-more-children order would not be issued. The respondent here has demonstrated that she gave birth to Anna as a biological function without the ability to care physically, emotionally or financially for her. She now has seven children she has proven she cannot raise.
This decision does not say that any particular group of people should not have children, or that a court should ever attempt to bar "poor people", for example, from having children simply because they are poor. It does say that individuals who have proven they have no ability to [*12]provide necessary care and stability for a baby should not conceive more children until they are willing and able to be minimally responsible parents. Many parents, even single parents with limited incomes, have multiple children and raise them well, and while it may be a struggle, it is a responsibility they do not ignore, abuse or pass to someone else. This decision does not support the concept that only people with middle or upper class incomes can have families of their choosing. 
Our society has reached the breaking point with respect to raising neglected children, often born with extraordinary needs. One only need look at our schools (particularly urban schools), our jails, our foster care budgets,[FN18] and our Family Courts to see that a serious change of direction is necessary in the interests of children, the taxpayers, and the community as a whole. If a parent falls within the factors presented above, any right to have more children under these circumstances is outweighed by both (1) society's right not to have the additional physical, social, emotional and financial burden of providing for yet another child and (2) the right of existing children to have the best chance possible of getting their own parent to raise them.
Restraining orders and injunctions are granted in the law when irreparable harm is to be avoided. (Civil Practice Law and Rules, Article 10.) The birth of yet another baby to the unrehabilitated respondent would bring irreparable harm to such a child not yet conceived and to Anna. It would make respondent even less able to get her life under control so that she can raise Anna and hopefully her other already existing children. A "no-more-children" order may help respondent get Anna back. More importantly, it may help Anna get her mother back. Such an order is not prohibited by the rules, statutes, or case law, and is within the purview of the goals of parental rehabilitation to be served by Family Court. The right to procreate is not absolute.[FN19]
THE RULING
The Department's proposed Dispositional Plan will be adopted, but with one additional ordering paragraph. The proposed plan already requires that the Department comply with section 131-e of the Social Services Law regarding the mandatory provision of family planning advice and free services, if desired.[FN20] Furthermore, it is the intention of the court that the mother be [*13]required by the dispositional order, and so long as it is in effect, to not get pregnant again, until she is capable of raising her children and has reclaimed all of her children who can be reclaimed lawfully from foster care or other caretakers. This is not ordering the respondent to never have another child. It means the respondent shall be required to act like a responsible parent who wants a relationship with her children, and for the duration of the order, to conceive no more children. This condition is not overly broad. It does not eliminate the respondent's ability to exercise her constitutional right to procreate and parent. Instead, this condition is reasonably related to the Family Court and Social Services Law statutory goal of rehabilitating the respondent mother, because it would assist the respondent in conforming her conduct to the minimal competence level required to allow her to act as Anna's custodial parent. This condition has been narrowly tailored to serve the compelling state interest of requiring parents to raise their own children i.e., love them, care for them, provide for them.[FN21] As stated in Matter of Bobbijean P., supra , "Constitutional rights provide protection of basic rights but there is no basic right to be protected when the potential 'right to have a child' would equal the right to neglect a child and commit a crime against that child, or force others to raise it, both physically and at public expense." (Emphasis added.) Thus, the additional ordering paragraph shall state:

ORDERED that effective upon the date of personal service of a copy of this order upon respondent and so long as this order or an extension of it is in effect, the respondent shall not get pregnant again until and unless she has actually obtained custody and care of Anna and every other child of hers who is in foster care or with a relative resource and has not been adopted or institutionalized;
It should be noted that no evidence was presented to indicate that lack of available services is the problem. Society and the Department have available resources and services, and they have been offered to this respondent many, many times. She does not choose to take advantage of these offers and must be held responsible for her choices.
It is painfully obvious that a parent who has already lost to foster care all seven of her children born over a 12-year period, with the last one having been taken from her even before she could leave the hospital, should not get pregnant again soon. She should not have yet another child which must be cared for at public expense and without any physical, emotional or financial help from her, unless and until she has proven herself able to care for her existing [*14]children children who are entitled to their own mother.
 At this time the court is simply recognizing that the best way for the respondent to become a capable parent for her newest baby, Anna, as well as for her other children, is to concentrate on the actions necessary to make her an adequate parent and not to make being a parent even harder by having more children.
NOW THEREFORE, for the reasons set forth above, and after examination and inquiry into the facts and circumstances of the case and into the surroundings, conditions and capacities of the persons involved, and after hearing the proof and testimony, the Court finds and determines as follows:
Best Interests Findings
FOUND that return of Anna to their mother's residence would be contrary to the best interests of Anna because Anna would be at risk of abuse or neglect if returned to the mother due to B.J.'s need to address issues related to drug abuse, alcohol abuse, housing, income, parenting, mental health and domestic violence; this determination is based upon the petition filed May 6, 2004 and the evidence heard on July 1, 2004; and it is further
Reasonable Efforts Findings
FOUND that reasonable efforts, where appropriate, to return Anna home safely were made as follows: B.J. has been offered services to address substance abuse, housing, parenting, mental health and domestic violence issues, as well as visits with Anna; this determination is based upon the petition filed May 6, 2004, the evidence heard on July 1, 2004; and it is further
Findings Regarding Alternatives to Foster Care
FOUND that based upon the investigation conducted by the Monroe County Department of Human and Health Services, Division of Social Services, and the consent of respondent, the child's godmother, B. V., is a suitable person with whom Anna may appropriately reside; and it is further
Domestic Violence
FOUND that domestic violence has occurred in Anna's home, and imminent risk to Anna would not be eliminated by the issuance of a temporary order of protection or other order of protection directing the removal of B.J. from the child's residence;
NOW, after examination and inquiry into the facts and circumstances and after hearing the proof and testimony, it is
Placement: Disposition of Petition
ORDERED that the petition is GRANTED, and the placement shall run from July 1, 2004 to June 30, 2005, as follows: The child, Anna, shall remain in the care and custody of B. V. under the supervision of the Monroe County Department of Human and Health Services, for the following reasons: The Respondent needs more time to address issues identified in the dispositional plan, subject to further orders of this Court; and it is further
ORDERED that Anna shall not be returned to the care and custody of Respondent except [*15]upon further order of the Court; and it is further
Permanency Plan
ORDERED that the Petitioner's permanency plan for Anna, return to parent, is approved; and it is further
Reasonable Efforts
ORDERED that reasonable efforts shall be made to make and finalize the child's goal of reunification; and it is further
Dispositional Plan
ORDERED that the proposed dispositional plan submitted by the Petitioner is appropriate and is incorporated herein as follows and on the consent of the respondent/mother:
1) Respondent B.J. shall:
a. Cooperate with Monroe County Department of Human and Health Services caseworkers(s), allow reasonable access to the home for scheduled and unscheduled visits and inform the Monroe County Department of Human and Health Services of changes in address, telephone number, household composition or the child's whereabouts;
b. Sign and maintain releases of information enabling the Monroe County Department of Human and Health Services to have access to information from all Court-ordered services for the duration of this Order; the released information shall be limited to evaluations, attendance, progress notes, lab reports, recommendations and discharge summaries.
c. Undergo a substance abuse evaluation at an agency approved by the Monroe County Department of Human and Health Services and follow all recommendations, including entering a supportive living program such as at Liberty Manor, and following all recommendations;
d. Undergo a mental health evaluation at an agency approved by the Monroe County Department of Human and Health Services and follow all recommendations.
e. Maintain suitable housing and income; the housing shall be free of health and safety hazards;
f. Engage in parenting skills counseling at an agency approved by the Monroe County Department of Human and Health Services and demonstrate skills and knowledge learned during contacts with the child;
g. Have visitation as arranged and supervised by the Monroe County Department of Human and Health Services or by a person or agency approved by the Monroe County Department of Human and Health Services; visitation may increase and/or become unsupervised upon the consent of the Monroe County Department of Human and Health Services in consultation with the services providers and upon fourteen (14) days prior written notice to the Law Guardians; and
h. Comply with the following Order of Protection:
[*16]
i. Refrain from acts of commission or omission that tend to make the home or place of visitation not a proper place for the child;
ii. abstain from offensive conduct against the child or caretakers;

iii. Do not use or be under the influence of drugs or alcohol in the presence of the child;
2) The Monroe County Department of Human and Health Services, Division of Social Services, shall
a. Have the right to receive information and copies of records from all agencies providing services to a respondent under this Order, limited to evaluations, attendance, progress, lab reports, recommendations and discharge summaries; this right of access to information and records is based upon this court's determination that the interests of justice outweigh the need for confidentiality;
b. Have the right, together with the Law Guardian, to receive all information and copies of all records regarding the child who is the subject of this order; this right of access to information and records is based upon this Court's determination that the interests of justice outweigh the need for confidentiality; and it is further
Further obligations of the Petitioner
ORDERED that the Monroe County Department of Human and Health Services, Division of Social Services, shall
a. Assist the Respondent in complying with this Order by providing bus passes or tokens as needed;
b. Facilitate referrals for counseling for the child as needed;
c. Make appropriate referrals or recommendations for services outlined in the service/dispositional plan; and it is further
Statutory Family Planning Information and Free Services
ORDERED the Petitioner shall provide respondent with family planning information periodically and shall provide free family planning services to Respondent if requested pursuant to Social Services Law, § 131-e.
No further pregnancies
ORDERED, for the reasons set forth in the above decision, that effective upon the date of personal service of a copy of this order upon respondent and so long as this order or an extension of it is in effect, the respondent shall not get pregnant again until and unless she has actually obtained custody and care of Anna and every other child of hers who is in foster care or with a relative resource and has not been adopted or institutionalized; and it is further
Visitation Plans
ORDERED that the Respondent shall be entitled to a minimum of two visits per week with Anna, which shall be arranged and supervised by the Department, and said visits may take place where the respondent resides if she is not able to go to another location for visitation, due [*17]to being under house arrest or for any other reason; and the respondent/parent shall visit in accordance with the plan; and visitation may increase and progress to unsupervised upon the consent of the Monroe County Department of Human and Health Services, Division of Social Services in consultation with the service providers and upon fourteen (14) days prior written notice to the Law Guardian; and it is further
Progress Reports
ORDERED that Petitioner shall make a progress report to the Court, the parties and the law guardian not later than 60 days from the date of this order; and it is further
Planning Conferences
ORDERED that the parent and law guardian shall be notified of the planning conferences to be held and of her right to attend such conferences with counsel or other persons; and it is further
Additional Orders Regarding Placement
ORDERED that in the event that Anna absconds from the above-named custodial person, written notice of that fact shall be given within 48 hours to the Clerk of Court by the custodial person, stating the name of the child, the docket number of this procedure, and the date on which the child ran away; and it is further
ORDERED that a copy of the Service Plan shall be given by Petitioner to the parent along with a copy of this order; and it is
Deadlines for Permanency Petition and Hearing
ORDERED that if the child remains in foster care, Petitioner shall file a petition for the next permanency hearing no later than May 1, 2005, except for good cause shown, and the permanency hearing shall be completed by June 30, 2005.
DATED: December 22 , 2004s/MLO
 Rochester, NY __________________________________
HON. MARILYN L. O'CONNOR,
FAMILY COURT JUDGE
NOTICE: Pursuant to section 1113 of the Family Court Act, an appeal must be taken within thirty days of receipt of the order by appellant in court, thirty-five days from the mailing of the order to the appellant by the clerk of the court, or thirty days after service by a party or law guardian upon the appellant, whichever is earliest.
MAILED: LORI ANN RICCI, ESQ., JOSEPH P. CRIMI, ESQ., TYNISE EDWARDS, ESQ., STEPHEN R. WEISBECK, ESQ.
[*18]

 
Footnotes

Footnote 1: According to the records before the court, six different fathers are known, and the father of one of the children is unknown.

Footnote 2: At the time of the trial and this decision Anna had been moved from foster care and was placed with a relative who wants to qualify as a foster parent and was eligible for non-dependent care grant money until she qualifies and is approved as a foster parent.

Footnote 3: This court's order will be in effect while rehabilitation efforts are pending in this neglect case. A neglect order is typically made for one year and may be extended for periods of up to one year while rehabilitation efforts continue. It may be ended by a surrender of the child or termination of the parent's rights to be a parent. After a child has been in foster care for 15 of the most recent 22 months, the Department of Human and Health Services is obligated to bring an action to terminate the neglectful parent's parental rights, and to free the child for adoption (Social Services Law, § 384-b[3][l]).

Footnote 4: The respondent/mother's other six children were born in 1992, neglect found 2001; 1993, neglect found 2001; 1996, custody to aunt who raised him from age of four months, neglect dismissed; born 1997, neglect found 2001; born 2000, neglect found 2001, and born 2002, neglect found 2002 by default. 

Footnote 5: Those born in 1993 and 2002.

Footnote 6: Anna is respondent's third child known to the court to have been born with a positive toxicology for cocaine. Respondent's prior children born in 2000 and 2002 also tested positive for cocaine at their births.

Footnote 7: Respondent was awarded visitation twice per week, but the last information available to the court was that she was not exercising those visitation rights.

Footnote 8: Cf. Social Services Law, § 384-b(1)(a)(ii), "Guardianship and custody of destitute or dependent children; commitment by court order", which provides in part:
(ii) it is generally desirable for the child to remain with or be returned to the birth parent because the child's need for a normal family life will usually best be met in the home of its birth parent, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered;
(iii) the state's first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home; . . . (Emphasis added.)

Footnote 9: As used in this subdivision, "diligent efforts" shall mean reasonable attempts by an authorized agency to assist, develop and encourage a meaningful relationship between the parent and child, including but not limited to:
* * * * *
(3) provision of services and other assistance to the parents, except incarcerated parents, so that problems preventing the discharge of the child from care may be resolved or ameliorated;
(Emphasis added.)

Footnote 10: No neglect action was brought against any putative father regarding Anna.

Footnote 11: 22 NYCRR 205.83[a][5] provides that a respondent can be ordered to cooperate in obtaining and accepting medical treatment, psychiatric diagnosis and treatment, alcoholism or drug abuse treatment, employment or counseling services, or child guidance, and permit a child protective agency to obtain information from any person or agency from whom the respondent or the child is receiving or was directed to receive treatment or counseling. (Emphasis added.)

Footnote 12: This court has no intention of monitoring whether the respondent is pregnant or not at any given time. There is no need. If respondent were to become pregnant, that fact would probably become obvious from changes in the mother's appearance and unquestionably would be established through the birth of a child. If necessary, genetic marker tests can determine the identity of mothers and fathers. Furthermore, as with any respondent who may be guilty of violating an order, there is discretion with respect to bringing a petition for a violation, and a respondent is entitled to due process. A finding of contempt would not be automatic. This would only occur after evidence of a violation was alleged in a petition and a proceeding complete with all due process rights was conducted to determine whether the respondent willfully violated the order.

Footnote 13: See Smith v Organization of Foster Families, 431 US 816, 844, 850. Compare the constitutional right of privacy that protects the right to practice birth control (Griswold v Connecticut, 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678), a woman's right to an abortion (Roe v Wade, 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705, supra ), and a homosexual's right to engage in consensual sex with another homosexual (Lawrence v Texas, 539 U.S. 558, 156 L. Ed. 2d 508, 123 S. Ct. 2472). 

Footnote 14: Penal Law, § 260.10.

Footnote 15: Demonstrating clearly how children come with responsibilities is L. Pamela P. v Frank S., 59 NY2d 1. There a woman allegedly deceived a man about her use of contraception and conceived and bore his child. Her deception was no defense to his full child support obligation.

Footnote 16: For example, birth control pills, the patch, abstinence, Depo-Prevara shots which last for 3 months, Norplant implants that last for years, natural family planning, the sponge, and condoms are well-known methods of birth control. Using two methods of birth control at the same time would obviously seriously decrease the likelihood of unintentional pregnancy caused by the failure of one method of birth control. Traditional vasectomy, no-scalpel vasectomy, and tubal ligation are methods of sterilization now available. 

Footnote 17: Social Services Law, section 384-b(4) provides that one of the reasons for an order committing the guardianship and custody of a child is that the "parent or parents, whose consent to the adoption of the child would otherwise be required in accordance with section one hundred eleven of the domestic relations law, are presently and for the foreseeable future unable, by reason of mental illness or mental retardation, to provide proper and adequate care for a child who has been in the care of an authorized agency for the period of one year immediately prior to the date on which the petition is filed in the court". (Emphasis added.) Statutory use of the term "foreseeable future" has sound basis in the law ( E.g., In re Joyce T., 65 NY2d 39; In re Guardianship of Nereida S., 57 NY2d 636) and has been interpreted to mean for 2 or more years (see Matter of Christina C., 185 AD2d 843.)

Footnote 18: The foster care budget for Monroe County alone is $32 million per year with individual children costing from approximately $22,000 to $90,000 per year.

Footnote 19: E.g., a man has no right to rape a woman of his choice in order to have her bear his child. Neither an adult man or woman has a right to have sexual intercourse with a child in order to have a baby with that young person. That is statutory rape. There are criminal statutes against incest. An incarcerated person cannot exercise his or her right to procreate at will. State laws prohibit bigamy.

Footnote 20: The section states, "Each social services commissioner shall require that appropriate members of his staff personally advise eligible needy persons periodically of the availability at public expense of family planning services for the prevention of pregnancy and inquire whether such persons desire to have such services furnished to them. In those cases where such services are desired, they shall be made available at public expense under appropriate provisions of this chapter. Nothing herein shall be construed, however, to require or permit coercion of such persons to request or receive family planning services.

Footnote 21: Cf. Wisconsin v Oakley, 245 Wis.2d 447 (2001), cert den. 537 US 813. In this criminal case, the father of nine children, pled no contest to three criminal counts of intentionally refusing to support his children. The sentencing judge imposed of a condition of probation requiring that defendant could not have any more children unless he could show he had the ability to support them and that he was supporting the children he already had. The Supreme Court of Wisconsin affirmed. This decision contains a lengthy list of restrictions on fundamental constitutional rights.