OPINION OF THE COURT
Patricia E. Gallaher, J.
This neglect case[1] against a drug-addicted admitted prostitute, mother of four children, none of whom are in her care, presents an all too typical problem in need of a better dispositional effort. This court, having removed the fourth child from the mother who does not know who the father is, by this decision is attempting to provide that better disposition.
The mother failed to appear at the initial removal hearing on August 31, 2016, and the child was placed with the putative father, under the supervision of the Department of Human Services (DHS).[2] Several other relatives were offered as possible resources including the putative father, but none other than the putative father had been approved as of the date of the initial appearance.
Not only was the respondent not present in court for the initial appearance, but she failed to appear at subsequent ap *297 pearances; this court issued a warrant for her to be brought to court. On September 28, 2016, the mother was brought to court by the Monroe County Sheriffs Department following her arrest on multiple warrants in addition to the Family Court warrant. The mother appeared in person, was advised of her right to counsel, and was assigned an attorney that very day. The mother initially answered the petition, denied the allegations in the petition, and reserved her right to request a Family Court Act § 1028 hearing. That was the last time the mother appeared before this court. She never returned or participated in the proceedings in an effort to work towards the return of her youngest child.[3]
Jurisdiction
The mother, Brandy F., finally appeared in person, acknowledged receipt of the petition, and was appointed counsel. The court found that the respondent was personally served with the summons and petition, and this court thereafter established personal and subject matter jurisdiction. At the only appearance the mother made, she was brought to court as a result of her being incarcerated on multiple warrants. She failed to give a proper address, or otherwise indicate where she was living, or intended to live upon her release from jail. This court also finds that all notices for subsequent court appearances were sent to all the addresses in the court records, as well as to her attorney. All the notices contained the proper warning that should she fail to appear for further court proceedings, the matters could proceed by default, as personal jurisdiction has already been established.
A fact-finding hearing was scheduled for December 5, 2016, the respondent was sent a notice to appear in court, at her last known addresses, on or about November 1, 2016, with a notice that the matter will proceed with or without her presence, and that if she did not appear, default testimony may or will be taken and a warrant could be issued for her arrest. The court finds that the respondent had ample notice of the hearing scheduled for December 5, 2016. She was represented by counsel at the fact-finding hearing; her counsel chose not to participate but merely stayed in court throughout the proceedings. No excuse for her failure to appear was offered on *298 December 5, 2016, and the hearing properly went forward by default on that day.
Hearing and Evidence
The DHS called one witness for the fact-finding portion of the hearing, and one witness for the dispositional phase of the hearing; both testified credibly. The court draws a negative inference against the respondent for her failure to appear, and further for her failure to testify. Furthermore, received into evidence was the proposed dispositional plan. The court also took judicial notice of a prior neglect finding against this mother regarding another child, Joshua (xx-xxxxx-xx), and also of the termination of this mother’s parental rights regarding Joshua (x-xxxxx-xx). This court finds that the DHS has met its burden of proof, and established by a preponderance of the competent, material and relevant evidence, that respondent neglected her child by failing to provide adequate supervision and guardianship by unreasonably inflicting or allowing to be inflicted harm or substantial risk of harm by using drugs, particularly alcohol, cocaine and marijuana (Family Ct Act § 1012 [f] [i] [B]). The evidence also established that the child was a neglected child because the respondent failed to provide said child with adequate supervision and guardianship by unreasonably inflicting or allowing to be inflicted harm or a substantial risk thereof by other acts, conduct or behavior of a similarly serious nature requiring the aid of the court. The testimony also established that she failed to supply the child with adequate food, clothing and shelter, and that she had the financial means to do so or had been offered reasonable means to do so.
The testimony in this case clearly establishes that the mother had little or no prenatal care, that the baby was born prematurely with a positive toxicology for illegal drugs, and that the mother admitted use of illegal drugs during her pregnancy. There was credible testimony that she admitted using crack cocaine and methadone during pregnancy, as well as alcohol in the early months of her pregnancy, that she specifically admitted using illegal drugs prior to the actual delivery of this child, resulting in her and the newborn having positive toxicology screens at the hospital for both cocaine and opiates.
The Societal Context
Society and its problems are changing, especially with the incredible rise in the use of heroin, and this court needs to *299 adjust in response, instead of doing the same tired routine which does not solve the obvious problems in so many cases. The court tried this case by default and because of a shortage of time (due to the court’s pending retirement) advised counsel that it would be issuing this supplemental decision, after ruling the County could go forward and present the dispositional phase, in which the County asked for the court to adopt its typical plan for services as its order. To understand the court’s decision herein, this case needs to be placed in context.
Family Court neglect and abuse cases are about keeping children safe and rehabilitating parents as parents so their children can be returned to them after they have been removed because of the imminent risk to their safety while in their parents’ or parent’s care. Each neglect case is handled by the court, the Department of Human Services caseworkers and lawyers, and the attorneys for the parents and child based on its own specific facts. The County provides, at significant taxpayer expense and with intensive caseworker involvement, services to each parent and to each child removed from his or her parent(s) according to their individual needs. The cases are repeatedly reviewed by the courts, often every two to three weeks, so tweaks and adjustments can be made to the services and orders. When possible, children who are removed are placed with relatives or even non-relatives trusted by the parent(s), and supervised visitation is set up for the children to safely see their parents—in the hope that as services start working, visitation can be improved to monitored and even unsupervised visitation before a child is returned, at first on a trial basis and ultimately with a final order, in successful cases.
When no “relative resource” or friend can be found to raise the children on a temporary basis (and ultimately perhaps permanent basis), children who must be removed from their own parents for their protection are placed in foster care—i.e., with certified and specially trained strangers—whose job it is to raise the children as long as needed and to try to facilitate their return to the biological parent(s) (or guardian) from whom they were removed. Foster care is a service which costs more than $20,000 per year per child, and often more than $30,000 per year for older children. The more special needs a child has, the more it costs. The more issues a parent has, the longer it takes to return children to that parent. Sometimes time runs out for the parents—that is, it becomes clear they will not become able to take care of their removed children in a reason *300 able amount of time. When that happens, the parents’ parental rights may be terminated in another related lawsuit, freeing their children for adoption, and hopefully allowing permanency to be achieved for the children—permanency being a hopefully “forever home” with the relative, friend, foster parent or other person willing to take custody or adopt, as appropriate.
Research and experience has shown that children are almost always happier when with their own parents, and thus the court’s and County’s goal is to return children to their parents as soon as reasonably and safely possible. As this court often tells parents, first we make the children safe, then we try to make them happy.
When children are removed, a plan is promptly made as to the steps and improvements needed to enable the family to be put back together, safely, and stronger than before. Both the parents and the children get services as needed. Section 131-e of the Social Services Law requires the Commissioner of the Department of Human Services (through an employee) to counsel parents as to family planning methods available to them to prevent pregnancy on a regular basis as needed, and inquire of parents if they desire such services. If services are desired, the County has an obligation to pay for whatever method of contraception a person (usually the mother) might choose. Enacted in 1973, the year the constitutional right of a woman to have an abortion was upheld by the U.S. Supreme Court, it seems obvious that this statute, in the context of Family Court cases, is intended to reduce the number of new babies born to parents who cannot actually take care of the children they already have. It is clearly an effort to avoid abortions. Though every woman has a constitutional right to choose to have an abortion, it is nonetheless a tragic choice—one this court seeks to avoid having even to be considered. The best way to do this is obviously to avoid new pregnancies in neglect cases where the woman cannot take care of the children she already has—or even take care of herself. Thus, the undersigned court often reminds the assistant county attorney to make sure the assigned caseworker does her job of advising the mother (and father if there is one involved) of her section 131-e right to choose free contraception immediately.
Many parents whose children are removed cannot take care of themselves, let alone their children, due to mental illness, addiction, domestic violence, sex abuse of children in their care—at their hands or “under their noses”—criminal activity, *301 homelessness, lack of income, lack of parenting skills including the use of excessive physical punishment, and failing to meet needs for food, clothing, shelter, guidance, attention, education and medical care of dependent children. Parents whose children are removed generally are overwhelmed by their issues and their children’s needs. They need to bring their own lives under control so that they can raise their children according to the standards of a minimally adequate family (according to American standards). The court has considerable powers to effectuate change and routinely does such things as order parents to keep abusive boyfriends, girlfriends and other people away from the children, to get mental health and chemical dependency evaluations and follow treatment recommendations, to take parenting and domestic violence classes, to get sex abuse counseling, to go to doctor’s appointments for the children to learn how to handle their children’s special needs, and to clean up a filthy home, unfit for human habitation. This court has even ordered dogs and cats removed in an effort to simplify the parents’ lives because the animals are contributing to the filth in the home and being neglected along with the children. This court has often had to conclude the obvious—that if there is not enough money for food and clothing for the children there certainly is not enough for pets. If there is not enough time and energy to care for the children, the animals are certain to be getting abused and neglected as well. Children must come first. Common sense is applied by this court in an effort to achieve a successful return of the children with all deliberate speed.
Because of the complex nature of Family Court families and issues, with many mothers and fathers of related children, and the right to counsel of all parents, guardians and children, this court has had cases with as many as one dozen lawyers (all paid for by the taxpayers) who need to be assembled all at once to handle a case, though three to five lawyers in a case is more typical.
When children are removed from their parents and the County has developed a plan to enable the family to be reunited, then pursuant to that plan, both the parents and the children get services as needed, from whatever approved agencies and people can provide them, again at taxpayer expense. Section 131-e of the Social Services Law requires the Commissioner of the Department of Human Services (through an employee) to counsel parents as to family planning methods *302 available to them on a regular basis as needed, and creates the County’s obligation to pay for whatever method of contraception a person (usually the mother) might choose. Since Social Services Law § 131-e was enacted in 1973 (again, the year the right to abortion was upheld by the U.S. Supreme Court), it seems obvious that the purpose of the statute is intended to reduce the number of new babies conceived by parents who cannot actually take care of the children they already have and thus might resort to abortion in the case of a new pregnancy. Again, every woman has a constitutional right to choose to have an abortion, but it is a tragic choice—one this court seeks to avoid having to even be considered. The best way to do this is obviously to avoid new pregnancies in neglect cases where the woman cannot take care of the children she already has, let alone a new one, and usually cannot even take care of herself. Thus, the undersigned court frequently reminds the DHS attorney to make sure the assigned caseworker does his or her sensitive job of advising the mother (and father if there is one involved) of the parents’ section 131-e right to free family planning and contraception immediately.
Obviously in Family Court cases, contraception that can be obtained in one doctor’s appointment and lasts for several years is the simplest choice—and the most apt to be successful short of sterilization. Adding contraception to the parents’ consideration is not meant to complicate their lives—but to simplify them so they can do the other steps needed to get a removed child or children returned.
Over and over this court has had to order children removed from the mother only to see her show up in court in a few months obviously pregnant, often by another man, while the DHS caseworkers and the court are still working to help that very mother get her already born child or children returned. A new baby just makes the return of the already existing child or children that much less likely to happen—because it creates more for the particular pregnant mother to handle, especially once the new baby is born. Sometimes in such situations new babies are simply removed from the mother right at the hospital with a new neglect lawsuit, because the child would be at imminent risk of harm if released to the mother. In a rarer case, a mother may have improved enough that she can take the new baby home with her, but the constant demands of that new baby make it almost impossible for her to do the services she needs to finish to get her prior, already removed *303 child(ren) back in her care. Sometimes the unfortunate new baby is a special needs baby, perhaps born with a positive toxicology for illegal drugs and thus is going through withdrawal, requiring extensive medical care 24 hours per day. Sometimes a new baby does not get out of the hospital for weeks or months, while costing hundreds of thousands of dollars in medical costs and requiring the mother or other caretaker to get special medical equipment training in order to begin to care for the child adequately. All of these things happen—but they need not, if the respondent mother in a neglect case would responsibly not get pregnant again—just like responsible mothers everywhere, and not involved in neglect cases. Many parents understand and respect their own limitations—and this is what respondent parents in neglect cases need to learn to do as well.
This decision is about respondent parents being personally responsible—for the good of existing children. It is obvious to any responsible mother that if she is not in a position to take care of a new baby, she shouldn’t get pregnant. That is why many, many people use birth control. Some people use abstinence for that same purpose, or even the rhythm method consistent with Catholic teachings. It is also common for women in our culture to have unplanned or even unwanted pregnancies—and the court takes judicial notice of this reality. Sometimes an unplanned baby is simply incorporated joyously into the family. Sometimes an unwanted pregnancy results in an abortion, which is generally kept a secret because of the social stigma and guilt attached. In Family Court, an ill-advised pregnancy often results in another neglect case, another child not being raised by his or her own family, an older child or children missing out on the chance to go home to mom because mom cannot juggle them and the new baby, and more cost to taxpayers and more work for the court and the Department of Human Services. It is for these reasons that this court is adding some provisions to the County’s proposed plan when making its order in this case—because this court wants the subject baby, Steven, born xx/xx/2016, to get his best chance to go home with a rehabilitated mom without a newer baby making that less likely to happen.
The case at bar is exactly the kind of case where the respondent neglectful mother should be using birth control (or perhaps even abstinence or the less reliable rhythm method) and certainly this respondent would be if she were the typical *304 middle-class responsible mother we (i.e., the court, the attorney for Steven, and the DHS) would like her to become, for her sake and that of her children—all four of them.
First, this respondent mother has had her rights terminated with respect to her son Joshua in 2014. Joshua was born prematurely, addicted to illegal drugs, and had no identified father. The respondent had been prostituting herself to get money for drugs and admitted using illegal drugs throughout her pregnancy with Joshua.
Second, this mother had another child, Jaymee, who was removed from her in 2011 and has lived with her sister ever since. Jaymee, too, had been born addicted to illegal drugs and went through medically monitored withdrawal.
Third, her 16-year-old son Evan has been living with his maternal grandmother since 2007—after he was not protected from access to hypodermic needles while in his addict-mother’s care.
Fourth, then along came Steven, who was born prematurely at 29 weeks, and exhibited signs of withdrawal almost immediately after his birth. The child was under close medical supervision until his discharge from the hospital on August 31, 2016—33 days after his birth. The withdrawal process for so premature an infant was lengthy, as it often is for positive toxicology preemies.
Thus, what is particularly urgent and compelling about this case is that the mother is both a drug addict and a prostitute. She has admittedly been using methadone—which allows one to infer she was a heroin addict. Heroin kills. It pulls clean and sober people back into heroin use sometimes decades after becoming clean and sober. It is that powerful. And it is cheap. In our current culture it is a cheap substitute for prescription pain-killers, as well as a reputedly reliable provider of an incredible, extremely addictive “high.” It is readily available on the streets. It may be and often is cut with other drugs and chemicals and substances, and thus may be exceptionally lethal. Using it is like playing Russian roulette with one’s life— not a good idea for a parent with children. The respondent mother in this case may start using heroin (again) any moment now, despite the court’s and the County’s efforts. Indeed, she may already have returned to using heroin. Her failure to appear in these court proceedings except once, while her rights to her child were at stake, clearly demonstrates her life is out of control and that Steven, at the time of her default, had too *305 little value to her to inspire her to become clean and sober. That, however, could change. That is what the DHS has worked on and will continue to work on pursuant to the dispositional order herein.
It must be understood that in addition to the potential of death to a fetus if a mother overdoses on heroin, an all too common reality, and the potential of a long, painful withdrawal for a newborn baby addicted to his mother’s drugs of choice, there is another horrible potential future for the child of an addict which also motivates this court to order the mother not to get pregnant again. Drug-addicted, prostituting mothers of little children in our very own community often sell the use of their little children’s bodies to their johns, thus allowing their little children to be raped and sexually abused by those adult men, in their own beds, for a few extra dollars for more drugs. Literally children are being sold as sex victims for $5. This happens in our own Rochester community. It is happening to two year olds and three year olds and younger and older children. This court has learned of these events in cases which have come before it in the last decade. We live in an unimaginably terrible tale of two cities—where children have everything, and nothing, where they are loved and protected, and where they are beaten and raped. Human trafficking is here for the beastial pleasure of those willing to pay for it—and the victims range from desperate adult women, to teenage girls who mistake a pimp for a boyfriend, to infants and toddlers of both sexes, whose bodies are sold by their own horribly abusive, totally inadequate mothers.
In the face of this reality, I will do what I can, by ordering respondent Brandy F., age 35, (1) to listen to the birth control counseling the County is required to provide pursuant to Social Services Law § 131-e, (2) to see her ob-gyn doctor for whatever confidential advice that doctor may give her regarding birth control, sexually transmitted diseases, and anything else, (3) to see her regular medical doctor regarding her health generally, including her addiction, and (4) to take whatever steps she chooses (at no financial cost to her) to prevent her from conceiving another child, fathered by anyone, until she gets her life together and baby Steven safely back in her care. Steven deserves that. So do her other three children—two of whom are currently safe from termination of parental rights actions as they live with her relatives and would most probably rejoice in having a mother who was clean, sober and competent, and *306 hopefully even would love them as a mother should love her children.
This court has not yet seen a case in her court where a pregnant mother overdoses and dies, but in the last year there has been a shocking increase in the number of heroin-using couples and parents appearing as respondents in neglect cases. Like the mother here, they would appear to be typical middle-class, responsible parents—if they were clean and sober. (Interestingly, in the cases before this court the parents using heroin have all been Caucasian.) Based on the increase in heroin use and the potential for lethal overdoses, this court acknowledges that the time has come once again to say out loud the obvious—and to order it—i.e., that this mother should accept family planning counseling, and consult with her ob-gyn doctor, see her regular internal medicine doctor about her health, and should not conceive another child at least until after she gets baby Steven safely back in her care. A child’s right to his or her own parent surely is greater than a parent’s right to have more children without even the ability to raise them, be a daily presence or support, or contribute positively to their welfare. Parents’ rights to their children are constitutionally protected because families are worthy of fundamental constitutional protection. However, nowhere has this court found a case where a constitutional right to procreate was protected, when there was no reasonable possibility of that parent and child becoming a family. Could there be a constitutionally protected right to abandon your baby—or is it a crime? The answer appears obvious to this court. Abandoning your child is endangering the welfare of a child and it is a crime, not a constitutional right.
This court knows from prior experience as the law clerk for Family Court Judge Marilyn L. O’Connor, who wrote Matter of Bobbijean R (2 Misc 3d 1011 [A], 2004 NY Slip Op 50286[U] [Fam Ct, Monroe County 2004]), in which she directed a homeless, drug-addicted mother and father to not conceive any more children till they had all seven of their children returned to them from foster care, that the accolades for that commonsense decision came in from all over the country and even from as far away as Australia. Conservative FOX talk show host Bill O’Reilly proposed Judge O’Connor on television for the position of Secretary of the U.S. Department of Health and Human Services in his “dream cabinet.” What Judge O’Connor said was so obviously reasonable—it caught people’s imagination *307 and they were clearly ecstatic that someone finally mentioned the proverbial “elephant in the refrigerator”—i.e., people having endless babies they cannot take care of, at everyone else’s expense and with no regard for those children. She even was commended in my presence by at least one African-American community leader who had apparently seen enough responsible extended family members struggling to raise the children of irresponsible family members, and overwhelmed by that added responsibility forced upon them as good people.
Any judge in Family Court for more than a month has probably seen an elderly grandparent taking over the raising of one or more grandchildren because of a neglectful, inadequate parent. This burden becomes too much—for the children, the family and for society as a whole.
As stated in Judge Marilyn L. O’Connor’s courageous and cutting-edge decision in 2004, in Matter of Bobbijean R (2 Misc 3d 1011 [A], 2004 NY Slip Op 50286[U], *5 [2004]),
“All babies deserve more than to be born to parents who have proven they cannot possibly raise or parent a child. This neglected existence is an immense burden to place on a child and on society. The cycle of neglect often created by such births needs to stop. Our society has reached the breaking point with respect to raising neglected children, often born with extraordinary needs. One only need look at our schools, our jails, our Division of Human and Health Services budgets, and our Family Courts to see that a serious change of direction is necessary in the interests of children, the taxpayers, and the community as a whole.”
Judge O’Connor then went forward and directed that the mother and father in that case not conceive any more children until and unless either of the parents had successfully had their seven children returned to them. Judge O’Connor wrote:
“The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one’s children have been deemed ‘essential,’ Meyer v. Nebraska, 262 U.S. 390, 399 (1923), ‘basic civil rights of man,’ Skinner v. Oklahoma, 316 U.S. 535, 541 (1942), and ‘rights far more precious . . . than property rights,’ May v. Anderson, 345 U.S. 528, 533 (1953). ‘It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom *308 include preparation for obligations the state can neither supply nor hinder.’ Prince v. Massachusetts, 321 U.S. 158, 166 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, at 399, the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra, at 541, and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496 (1965) (Goldberg, J., concurring). To use the language of the United States Supreme Court, there is absolutely nothing precious about giving birth to repeated children, only to immediately require friends, relatives, or strangers, as well as society as a whole, to raise those children at its expense. The court must balance individual privacy rights with the state’s overriding interest in protecting children and limiting the financial and societal burden created by caring for neglected children. Parents who have more children when there has already been clear and convincing proof that those parents could not raise any children they now have, and that any new children, if not removed would be victims of neglect and/or abuse. Any constitutional right to parent under these circumstances is outweighed by society’s right to not have the additional physical and financial burden of providing for that child.” (See 2016 NY Slip Op 50286 [U], *5-6.)
This court recognizes that the Appellate Division, Fourth Department removed the provision directing no more pregnancies from her order but sincerely hopes that if appealed, the Fourth Department will take note of the change of circumstances that has occurred in our society, particularly regarding heroin use on an unforeseen scale, and acknowledge it was a mistake to delete the commonsense no more pregnancies order. Heroin is permeating our community. It is killing across class lines. The undersigned Judge has had two of her best friends lose grown-up, smart, adult sons to heroin overdoses despite going through rehab. It seems only reasonable to conclude some pregnant addicts are dying, too.
A family court employee told me recently that one Rochester fire station in one shift recently gave 19 doses of the drug used to prevent death from heroin overdoses. One reads in the newspaper about people found dead from heroin overdoses *309 routinely. Such situations permeate the news and the terrible increase in heroin use even was a presidential campaign issue. This court has seen about a half dozen seemingly “nice couples” show up as respondents in neglect cases where both are addicted to heroin and are literally throwing their lives away— and the lives of their children—in just this year. That was not happening when Judge O’Connor issued her decision. Heroin was relatively rare, not a plague upon our nation as it is now.
This emphasis on heroin cases should not be meant to imply that the undersigned Judge believes an order such as the one issued here is only appropriate in heroin cases. Far from it. This court thinks every child deserves to have the courts and the DHS do everything they can to reunite parents safely and happily with children. This includes taking all reasonable steps to prevent parents in neglect cases from complicating their lives by having more children when we are working to have them get their living, breathing, often desperate children back into their care as soon as possible. Asking such parents to act like normal, responsible parents—who would not carelessly have kids they couldn’t raise when they already have kids they aren’t raising—is eminently reasonable. It is not a burden. It is not a deprivation of a constitutional right to have children. It is a commonsense affirmation of the importance of children, and their right to have their parents.
Family Court neglect orders are mostly a list of steps the parents must take to get their kids back. The order in this case adds a few more steps that, if followed, would make the return to parent goal more achievable.
For those that criticize such a requirement, asking how can you enforce it, or fear it means women will resort to abortions to avoid going to jail for contempt of court, by breaking the ordering provision to not conceive more children, this court has the obvious answer. The additional requirements of this case are just like the other, routine, boilerplate requirements. The court and the DHS work with the parents to meet the terms of the order. Immediate perfection is not expected. Violation petitions are not immediately filed. Such a provision would be enforced the same way as an order not to use illegal drugs, or to go to parenting classes, or to get mental health treatment, or to not use corporal punishment on a child. We cannot make anyone do any of those things. We can invite them, order them, cajole them, make referrals, and facilitate the parent’s efforts. They don’t go to jail or get fined for not meeting the require *310 ments of a neglect order. That simply isn’t done—the point is to help the parents become parents, not to put them in jail. It takes a while for mental health and drug treatment to work and for parenting classes to be completed, for example. When a parent is really doing poorly, a violation petition can be and often is filed, and the time of the order extended, or an adjournment in contemplation of dismissal may be converted to a neglect finding if a violation petition is found to have merit. Nothing would change in that regard. If, despite an order to conceive no more children for a time, a woman got pregnant or a man impregnated a woman while his child(ren) were still in foster care, or not in his or her care, a violation petition could be filed. No one would go to jail. That is simply not the procedure used.
Nonetheless, it is possible to contemplate that someone could be held in contempt for a willful violation of an order for no more pregnancies or some other provision, and thus might end up in jail. It would be unprecedented to the best of this court’s knowledge, but possible. A willful violation of an order not to conceive more children would most assuredly be terribly hard to prove and thus would not likely be something any Department of Human Services would spend its limited resources trying to do. The normal procedure would be as it is now—the court and DHS would continue to work to return children if a mother gets pregnant while she is supposed to be or indeed is working to get another child or other children back in her care.[4] It is just harder to get children returned if a woman gets pregnant and has yet another baby. That is reality. In Family Court we try to reduce the number of issues left to be handled— not add to them. We try to simplify, not complicate, family life.
Jail for a violation of a “no more pregnancies” order is not the intent of this decision, just like jail is not any part of the routine procedures in violation cases now. The provision is another term in what is generally a long list of items in an order to be checked off as accomplished by a parent seeking to have his or her child(ren) returned. It is an important term, *311 because it makes the other terms easier to meet, and thus makes the return of a child more likely. It is a vital term to accomplish early, if at all, because family planning advice a day after a pregnancy has occurred means the advice is only good to prevent the next pregnancy.
Nor is a “no more prégnancies” provision intended in any way to make a woman who does not want an abortion, get an abortion. The DHS and court will work with a pregnant mother whether she chooses to have a child or not. In fact, knowing again from prior experience that some people fear that a “no more pregnancies” order will lead to unwanted abortions, this court will specifically include in its order a provision that if the respondent does get pregnant and chooses to have a child while this order is in effect, the DHS will continue to work with her as it has in the past and will not bring a violation petition asking that she be incarcerated because she is pregnant, thus taking that remote possibility off the table ab initio. And of course, the court and DHS will most likely never know, as now, if any woman has an abortion unless she volunteers that information—a fact which is normally kept strictly confidential for obvious reasons.
In conclusion, this court fails to see how asking a parent to be responsible like a typical decent parent should be, could be considered an abuse of discretion, and hopes that if appealed the Appellate Division will agree, and note that our community, and indeed our nation, is even more dangerous for children and unborn children and parents than it was in 2004, when Matter of Bobbijean P. was written. For this court to concede in any way that having more children but not taking care of them in the middle of a neglect case is somehow acceptable behavior simply makes no sense. This Judge will not pretend that having babies under such circumstances is alright, or be too afraid of being modified or reversed to try again to promote the fundamental new idea of Matter of Bobbijean P. Having no more babies while the taxpayers are paying for caseworkers and courts to work hard to help a parent get his or her children back is a good thing and should be asked for and ordered as a matter of routine. Having no more pregnancies should be ordered like the drug treatment, mental health treatment, and parenting classes provisions which are boilerplate now.
Unfortunately for the child removed, the consequences of the parent’s failures fall on the innocent child, as well as on the parent. That child’s rights to his or her own parent may *312 ultimately be terminated. Although the wording used by the courts is that the parent’s rights to a child are terminated, the effect is the same as if the child’s right to the parent were terminated.
Analysis of this Specific Case
Throughout the instant proceedings, the mother’s whereabouts have been largely unknown. These are not the actions of a person most desirous of reuniting with her child. These are the actions of a person so deeply embedded in the drug addiction that controls her life, that she is at risk of harm to her own health, safety and welfare. A newborn infant’s positive toxicology test for cocaine without more evidence will not—in and of itself—sustain a neglect finding, but an additional finding, such as imminent danger due to a mother’s drug usage history, does provide an adequate basis. (See Matter of Bobbijean P., 2 Misc 3d 1011 [A], 2004 NY Slip Op 50286[U] [2004], citing Matter of Nassau County Dept. of Social Servs. v Denise J., 87 NY2d 73 [1995]; Matter of Theresa J., 158 AD2d 364 [1990]; Matter of Nassau County Dept. of Social Servs. v Laquetta H., 191 AD2d 567 [1993]; Matter of Stefanel Tyesha C., 157 AD2d 322 [1990], lv granted 164 AD2d 852 [1990], appeal dismissed 76 NY2d 1006 [1990], mot denied 77 NY2d 866 [1991]; Matter of Department of Social Servs. v Felicia B., 144 Misc 2d 169 [1989].)
Accordingly, this court determines that by clear and convincing evidence, the respondent has neglected her new baby Steven, Jr., such that his physical condition is in imminent danger of becoming impaired (Family Ct Act § 1012 [f] [i]) by her history of drug usage, her failure to get substance abuse and mental health treatment as previously ordered, her failure to have suitable housing for herself and the newborn infant, and the failure to plan for the baby and have baby supplies (cf. e.g. Matter of Busch v Margaret B., 109 AD2d 837 [1985]; Matter of Shane O., 147 AD2d 733 [1989]).
Disposition
The DHS asked that the court adopt its proposed dispositional plan (Family Ct Act § 1052). That plan will be adopted, but with five additional ordering paragraphs, as set forth below. The reasoning behind the additional provision lies in the history of this case and is well detailed above.
This court recognizes that the case cited above {Matter of Bobbijean P.) was modified on appeal by the Appellate Divi *313 sion, Fourth Department (deleting only the provision that the mother should not get pregnant again until after her children were returned to her), but it did so on a procedural hinge, not on the constitutionality of the provision requiring no further conception of children until their existing children were returned to one or both of the parents. In fact, this court urges a review on the constitutional issues raised herein. As set forth in 4 NY Jur 2d, Appellate Review § 639:
“The principle that a court’s power to declare the law is limited to determining an actual controversy in a pending case is subject to an exception that permits courts to preserve particular issues that are recurring, of substantial public importance and novel, and that typically evade review. However, no blanket rules will be made to accept any particular type of case, since the determination of whether to consider particular issues despite their mootness must depend on the recurring, novel and substantial nature of those issues as they are presented
“In addition, while it is the general policy to simply dismiss an appeal that has been rendered academic, vacatur of an order or judgment on appeal may also be an appropriate exercise of discretion where necessary in order to prevent a judgment which is unreviewable for mootness from spawning any legal consequences or precedent.”
Based on the history of decisions such as this, and based on the continuing neglect filings, the ongoing and increasingly expensive issues facing society as a whole with an upward spiraling of the number of drug-addicted parents—this would seem to be a recurring, novel and substantial issue.
To that end, this court is directing DHS to include provisions in the final dispositional order that (1) requires DHS to comply with Social Services Law § 131-e, (2) directs respondent to listen to the birth control counseling the County is required to provide pursuant to Social Services Law § 131-e, (3) directs respondent to see her ob-gyn doctor for whatever confidential advice that doctor may give her regarding birth control, sexually transmitted diseases, and anything else, (4) directs respondent to see her regular medical doctor regarding her health generally, including her addiction, and (5) directs respondent to take whatever steps she chooses (at no financial cost to her but at the expense of the DHS if there is any expense) to *314 prevent her from conceiving another child, fathered by anyone, until she gets baby Steven safely out of foster care and back in her care.
In its written decision in Matter of Bobbiejean P., the Appellate Division, Fourth Department Justices also stated,
“We conclude that the court should have granted respondent’s motion [to vacate the no more pregnancies provision] because it had no authority to impose the ‘no pregnancy’ condition. ‘Family Court possesses only the power which is explicitly conferred on it by statute’ (Matter of Martin v Martin, 127 AD2d 266, 269 [1987]; see Matter of Lamedh B., 299 AD2d 966 [2002]; Matter of Borkowski v Borkowski, 38 AD2d 752 [1972]). Here, the conditions that may be imposed on respondent are authorized by Family Court Act § 1057, which provides that ‘[r]ules of court shall define permissible terms and conditions of [DHS’s] supervision’ over respondent. Those ‘rules of court’ are set forth in 22 NYCRR 205.83 (a) and (b), and none of the conditions authorized therein includes prohibiting procreation, nor does any authorized condition impliedly include such a prohibition. Specifically, we reject the contention of the Law Guardian and the reasoning of Judge O’Connor in Matter of V.R. (6 Misc 3d 1003[A], 2004 NY Slip Op 51706[U], *6-7) that the ‘no pregnancy’ condition is impliedly authorized by section 205.83 (a) (5), (b) (2) or (b) (7). In our view, the compelled use of birth control measures is not encompassed within the term ‘medical treatment’ under subdivision (a) (5), nor does a prohibition against reproduction address the goals of remedying the acts found to have caused the neglect or of safeguarding the well-being of the child within the meaning of section 205.83 (b) (2) and (7), respectively.” (See Matter of Bobbijean R, 46 AD3d 12,12-15 [2007].)
This court respectfully disagrees with the Appellate Division Justices, in that this is a serious and persistent medical problem. This order does not compel birth control measures, but rather directs both DHS and the mother to comply with the statute already in place in the Social Services Law, requiring that family planning services be discussed, offered and paid for by DHS. This is a medical treatment issue. Any woman understands this. Furthermore, drug addiction is a disease, *315 and as such when a mother and a child have addiction issues, there are significant health concerns involved for both persons. For an infant, the use of illegal drugs and alcohol by the mother while the infant is in útero can have lifelong effects that seriously impede and potentially impair the child’s health and development. The adult may be in the grips of a drug-induced addiction, but the person still has free will to a degree. The unborn infant does not, and as such, presents an even greater issue for the courts to offer whatever protections may be available medically, as the devastating effects of illegal drugs on a child while developing prior to birth are documented and often tragic.
In the instant case, it is the intent of this court to require, not that the mother refrain from ever getting pregnant in the future, but to put in place a way for this young woman to get the help she needs before she gets pregnant again, to put in place safeguards and knowledge for the mother to avoid pregnancy, and to enable some measure of compliance, so that if this mother does again become pregnant, any future unborn fetus may get the significant intervention necessary to ensure the positive health and development of the unborn child. There has been ample evidence admitted in this case to show the pattern and history of drug abuse by this mother, the pattern and history of giving birth to drug-addicted infants, and the pattern and history displayed by this mother who essentially leaves the young drug-addicted infants with others who can care for the babies, while never really engaging in services to help herself, despite the repeated and numerous offerings. An intervention in this cycle is needed here, and that is what this court is doing.
Conclusion
Because of the above facts, the court finds that the child’s physical, mental and emotional conditions were impaired or in imminent danger of becoming impaired and the respondent did not exercise a minimum degree of care with respect to her child. Accordingly, the grounds for a neglect finding have been established. Further, the dispositional phase of the proceedings showed that the proposed dispositional plan admitted into evidence should be adopted and incorporated into a final order, with some additional provisions as set forth more fully above. The DHS has sustained its burden of proof, in toto, and shall submit a dispositional order in accord with this decision.

. The mother was alleged to have neglected this child by failing to provide adequate supervision and guardianship by unreasonably inflicting or allowing to be inflicted harm or substantial risk of harm by using a drug or drugs; by failing to provide said child with adequate food, clothing and/or shelter although financially able to do so or offered the financial means to do so, and for failing to provide said child with adequate supervision and guardianship by unreasonably inflicting or allowing to be inflicted harm or a substantial risk thereof by other acts, conduct or behavior of a similarly serious nature requiring the aid of the court.

. The putative father was not named as a respondent initially, and the child was discharged from the hospital to his care, under the supervision of DHS. On September 28, 2016 a new neglect petition was filed against the putative father under docket No. xx-xxxxxx-xx, and the child was removed from his care and placed in foster care.

. The original petition regarding Steven, Jr. was filed only against the mother, as DHS did not have sufficient allegations against the putative father, Steven D., Sr.

. Of course if a parent is ordered to have no more children and is found in willful violation of that order and thrown in jail by some judge, at some point in the future, at least in jail that mother would get prenatal care and have food, clothing and shelter. The mother would have little and hopefully no access to illegal drugs. She could take courses offered in jail to improve herself. The newborn baby could be left with her to be raised by her in jail (the court has seen that done in the Monroe County Jail)—or could be removed to a relative or foster care if that were deemed more appropriate.